# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BLUE CROSS AND BLUE SHIELD ASSOCIATION,<br><br>                    Plaintiff,<br><br>         v.<br><br>ALLIANZ GLOBAL INVESTORS U.S. LLC,<br><br>                    Defendant. | Case No. 20 Civ. 10848<br><br>**<u>COMPLAINT</u>**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Blue Cross and Blue Shield Association (the "Association") brings this Complaint against Defendant Allianz Global Investors U.S. LLC ("Allianz") to recover the tens of millions of dollars in losses the Association suffered as a result of Allianz's mismanagement of the Structured Alpha investment strategy.

## NATURE OF THE CLAIMS

1.      The Association is a nonprofit association of 36 independent, community-based and locally operated Blue Cross Blue Shield companies.  The Association owns and manages the Blue Cross and Blue Shield trademarks and names and also grants licenses to the independent Blue Cross Blue Shield companies to use the trademarks and names in exclusive geographic areas.

2.      The National Employee Benefits Committee (the "NEBC"), which has brought the largest single claim to date—more than $2 billion—related to investment losses in Structured Alpha, is an independent committee of the Association.  *See Blue Cross & Blue Shield Ass'n Nat'l Emp. Benefits Comm. v. Allianz Global Inv'rs U.S. LLC et al.*, No. 20 Civ. 07606 (filed

Sept. 16, 2020).  The NEBC has brought that claim as a fiduciary on behalf of a trust holding the assets of more than a dozen employee pension plans that it administers.  The Association sponsors one of those plans, while other Blue Cross Blue Shield licensees sponsor the remainder. All are employee pension benefit plans under the Employee Retirement Income Security Act of 1974 ("ERISA").

3.      Separately, the Association had two corporate investments in Structured Alpha that are not governed by ERISA.  This case is about those investments.

4.      The first investment involved assets that support the Association's general operations (the "Operating Assets").  The second involved assets the Association and the Blue Cross Blue Shield companies earned for administering and underwriting the Service Benefit Plan, a/k/a the Federal Employee Program (the "FEP"), one of the Federal Employee Health Benefits Plans.[1]  The Association invested a portion of these assets, known as the FEP Service Charge, on behalf of the Blue Cross Blue Shield Companies (the "FEP Service Charge Assets").

5.      Both Association investments were in the US Fixed Income Series (the "Series"). The Series was one component of a fund called AllianzGI Structured Alpha Multi-Beta Series LLC I (the "Fund").  Allianz was the managing member of the Fund, which Allianz created only for the Association and its affiliates.

6.      The Association's corporate investments were significant.  By the end of 2019, the Association had approximately $69 million invested in the Series.

7.      The Association made and maintained those investments based on assurances from Allianz that "structural risk protections" were the cornerstone of Structured Alpha.  While

---

[1] In existence for sixty years, the FEP provides health insurance to millions of federal employees, retirees, and their families.

the Fund and the Series would generate returns through an options trading strategy, Allianz promised that hedges would be in place "at all times" to cap the downside risk of that strategy. Allianz told investors that these hedges would cabin investment losses to a "defined maximum loss," afford "reinsurance" against a market crash, and eliminate the risk of a margin call. Allianz also assured investors that Structured Alpha would pursue a "risk-controlled return profile."  And the investment strategy, Allianz claimed, would perform "regardless of market conditions" and whether markets were "rising or declining" or "smooth or volatile."  The "nondirectional nature of our option portfolio's investment process," Allianz claimed further, "is one of its greatest strengths."

8.      These claimed protections were critical to the Association's decision to invest tens of millions of dollars in Structured Alpha and maintain those investments, especially given the risk profile the Association desired for its investments.

9.      Yet when equity markets declined, volatility spiked, and the option positions in the Fund and the Series were exposed to a heightened risk of loss in February and March 2020, those promised protections were absent.  Unbeknownst to the Association, contrary to Allianz's stated investment strategy, and in violation of the fiduciary duties it owed as the Fund's managing member, Allianz had abandoned the hedging strategy that was the promised "cornerstone" of Structured Alpha, leaving the portfolio almost entirely unhedged against a spike in market volatility.  To make matters worse, Allianz had placed a directional bet that volatility would remain relatively low, the equivalent of a ticking time bomb if its forecast (one it had promised "never" to make) proved wrong.

10.      As Allianz has since admitted, it constructed the portfolio to offer no downside protection against the market decline and volatility spike that occurred in February and March

2020.  Contrary to its promise to investors that it would always purchase hedges as "reinsurance" for the options it sold, Allianz had purchased *no* hedges for an entire segment of the portfolio. Meanwhile, the so-called hedges that Allianz did purchase were not the hedges Allianz said it would.  Allianz had told investors it would buy hedges at a strike price 10% to 25% below the market, but the hedges it actually held at the end of February 2020 were as much as 60% below the market.  Given these and other departures from Structured Alpha's purported investment strategy, Allianz had constructed the portfolio not to pursue "risk-controlled returns" as it had promised but instead to earn marginal returns selling insurance against market volatility while maintaining no meaningful protection against the downside associated with the large tail risk of a market collapse—a strategy that has been aptly described as picking up pennies in front of a steamroller.

11.     In further derogation of its duties and scrambling to address the fallout from its recklessness, Allianz added yet more risk to the portfolio in February and March 2020.  Whereas Allianz had told investors it would purchase *and maintain* hedges that would automatically cap the "maximum loss" investors could sustain in a market downturn, Allianz *sold* the hedges that could have protected the Association's investments and then added more risk-bearing positions in an apparent bet that the market would recover.  These new risk-bearing positions were also built without an appropriate hedge in place, exposing the Fund and the Series to further, catastrophic losses and ultimately the margin call that Allianz had told investors could never happen.

12.     Allianz's reckless actions, both in constructing the portfolio to bear excess, undisclosed risk and in restructuring the portfolio to chase returns rather than preserve investor

capital, reveal that Allianz placed its own interests in generating performance fees ahead of its duty to safeguard investors' assets against undue risk.

13.     The Association suffered substantial losses as a result of Allianz's misconduct.  In a matter of weeks, Allianz had lost roughly two-thirds of the Association's investments—about $46 million.  These losses far exceed what the Association would have lost had Allianz properly managed the Fund and the Series or had the Association invested its money in the fixed income markets or in a comparable, prudently managed investment strategy.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action under 28 U.S.C. § 1332(a) because the parties are citizens of different States, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

15.     Venue in this judicial district is proper under 28 U.S.C. § 1391(b), including because a substantial part of the events or omissions giving rise to the Association's claims occurred in this district.  Allianz has also consented to venue in this judicial district in its agreements with the Association.

## PARTIES AND OTHER ENTITIES

16.     Plaintiff Blue Cross and Blue Shield Association is an Illinois not-for-profit corporation with its principal place of business in Chicago, Illinois.  The Finance and Audit Committee, which reports to the Association's Board of Directors, makes investment decisions related to the Association's Operating Assets, including the decision to invest a portion of those assets in the Series.  The stated investment objectives for the Operating Assets include "prudently invest[ing] funds" to further the interests of the Association and its affiliates and to "maintain liquidity and preserve principal" to meet the Association's cash needs.  The FEP

Board of Managers, which also reports to the Association's Board of Directors, approves investment decisions related to the FEP Service Charge Assets, including the decision to invest a portion of those assets in the Series.  The primary investment objective for the FEP Service Charge Assets is "to preserve liquidity and principal, while secondarily maximizing return." Association staff oversee the investment of the Operating Assets and FEP Service Charge Assets.

17.    Defendant Allianz Global Investors U.S. LLC is a Delaware limited liability company and registered investment adviser under the Investment Advisers Act of 1940 with its principal place of business in New York, New York.  As of December 31, 2019, Allianz managed more than $140 billion in client assets.  Allianz is part of "Allianz Global Investors," the marketing name for a global asset management business operating through affiliated entities around the world.  Allianz's ultimate corporate parent is Allianz SE, which is headquartered in Germany.

18.    Allianz Global Investors U.S. Holdings LLC is Allianz's sole member.  It is also a Delaware limited liability company with its principal place of business in New York.

19.    PFP Holdings, Inc. is the sole member of Allianz Global Investors U.S. Holdings LLC.  It is a Delaware corporation with its principal place of business in California.  It is owned indirectly by Allianz SE.

## FACTUAL ALLEGATIONS

### Allianz Markets the Structured Alpha Strategy

20.    The Structured Alpha strategy consists of alpha and beta components.  The beta component is intended to provide broad market exposure to a particular asset class through investments in financial products (like exchange-traded funds) that replicate the performance of a market index (like the S&P 500).  The alpha component is an options trading strategy that

Allianz claimed would seek "targeted positive return potential" while nonetheless maintaining "structural risk protections."

21.     Allianz has described Structured Alpha as consisting of an options "overlay" (*i.e.*, the alpha component) designed to exhibit low correlation to the underlying equity or fixed income beta exposure.

22.     The options strategy was largely the same regardless of the Structured Alpha fund or its underlying beta(s).  Allianz touted the strategy to investors as "non-directional," meaning it "is not predicated on correctly taking a view on the direction of equities, interest rates or any other fundamental factor."  Thus, Allianz represented the Structured Alpha strategy would "never make a forecast on the direction of equities or volatility."

23.     As for the "structural risk protections" supposedly essential to the strategy, Allianz claimed that Structured Alpha would "combine[] both long- and short-volatility positions at all times."  While the strategy would "capitalize on the return-generating features of selling options (short volatility)," it would "simultaneously benefit[] from the risk-control attributes associated with buying options (long volatility)," Allianz said.

24.     The "building blocks" of Allianz's strategy were supposed to be three types of positions: (1) range-bound spreads, (2) directional spreads, and (3) hedging positions.

25.     The range-bound spreads, Allianz represented, are "short-volatility positions" that are "designed to collect option premium and to generate excess returns in normal market conditions."  "Based on detailed, proprietary statistical analysis," Allianz explained, "put and call options are sold to create 'profit zones' that have a high probability of success upon expiration of the options."  The "profit zones aim to catch the underlying equity index inside their upper and lower bands at expiration."  If "the equity index finishes inside the profit zone at expiration, the

strategy will profit," according to Allianz.  Allianz claimed these range-bound spreads generated roughly two-thirds of the strategy's returns.

26.    The directional spreads, Allianz represented, are "combination long-short volatility positions designed to generate excess returns when equity indexes are rising or declining more than usual over a multi-week period."  They "are built by buying and selling options to both the upside and downside to create profit zones several percentage points away from current equity index levels."  These spreads "are set up to capture larger equity-market movements" and to "act as portfolio diversifiers."  Allianz claimed they accounted for roughly one-third of the strategy's returns.

27.    In presentations about Structured Alpha, Allianz depicted the range-bound spreads and directional spreads as follows, with the so-called "profit zones" in blue compared to the "loss zones" in gray:



28.     Allianz represented that the hedging positions would be the third component of Structured Alpha and a "cornerstone" of the strategy.  These are "long-volatility positions" that Allianz told the Association are "designed to protect the portfolio in the event of a market crash." Allianz claimed it would purchase the hedges "out of the money at various levels to the downside, and always in a greater quantity than the amount of puts sold for the range-bound positions."  Allianz emphasized that the "long puts are in place ***at all times***" and "***exclusively*** for risk-management purposes."[2]

29.     Allianz depicted the long-put hedging positions as follows, illustrating (as Allianz commonly represented) that it would purchase the hedging positions "-10% to -25%" below the market:





---

[2] All emphases are added unless otherwise noted.

30.     Allianz regularly analogized Structured Alpha's three-pronged, long-short investment design to selling "insurance" against market volatility (referring to the range-bound and directional components of the strategy) and buying "reinsurance" to protect in the event such volatility was experienced (referring to the hedging component of the strategy).

31.     Allianz told investors that the "seller of the option is the insurance company" while the "buyer of the option is the insurance policyholder."  Allianz promised to be a "buyer and seller of options at the same time, at all times."  "We are always *both* the insurance company and the insurance policyholder," Allianz represented.  (Emphasis in original.)

32.     Greg Tournant, Allianz's chief investment officer for U.S. structured products and the architect of Structured Alpha, consistently used the insurance/reinsurance analogy to describe the strategy he developed.  In a May 2016 interview, Tournant said that Allianz is "acting like an insurance company" when it "collect[s] premium" by selling options.  Although Allianz may have to "pay very much like an insurance company" if a "catastrophic event" occurs, Tournant reassured the audience that Structured Alpha's hedging positions would act as "reinsurance" to "protect the portfolio."  And Tournant emphasized that he and his team at Allianz consider themselves "risk managers first and return managers second."

33.     Allianz also promoted the close relationship with its ultimate corporate parent, Allianz SE, in marketing Structured Alpha.  Allianz claimed, consistent with the unified risk management framework that Allianz SE touts in its annual reports, that risk was "continuously managed and monitored" at the "firm level."  Assisting these risk management efforts, Allianz told the Association, was IDS GmbH, a wholly owned subsidiary of Allianz SE, that supposedly provided ongoing risk analysis reports.  Allianz's direct parent, Allianz Global Investors U.S.

Holdings LLC, purportedly oversaw Allianz's "day-to-day portfolio management and investment operations," including risk management.

### The Association Invests in Structured Alpha Based on Allianz's Representations

34.     Relying on Allianz's representations about Structured Alpha's "risk-controlled return profile" and its hedges being in place "at all times" to "protect the portfolio in the event of a market crash," the Association invested corporate funds in Structured Alpha.

35.     The Association's initial investments, effective March 1, 2015, were $12.5 million of Operating Assets and $12.5 million of FEP Service Charge Assets, for a total of $25 million.  The Association invested additional Operating Assets in Structured Alpha over time, but always with the understanding, based on Allianz's ongoing representations, that Allianz was employing the same risk-controlled investment strategy it had described.

36.     The Association invested in only one component of one Structured Alpha fund: the US Fixed Income Series of the AllianzGI Structured Alpha Multi-Beta Series LLC I.  As its name suggests, the Series had a fixed income beta exposure: the Barclays U.S. Aggregate Bond Index.

37.     The strategy's alpha component was designed to outperform this fixed income index.  The targeted outperformance for the Series varied based on the level of the Chicago Board Options Exchange Volatility Index (the "VIX"), an index measuring the market's expectation of volatility, when Allianz was building its option positions.  The lower the VIX, the lower the excess return Allianz was supposed to target.

38.     The Fund was organized as a limited liability company of which Allianz was the managing member.  The Association's investments in the Fund and the Series were subject to a collection of agreements that memorialized various duties Allianz had undertaken with respect to the Association.  These agreements include the AllianzGI Structured Alpha Multi-Beta Series

LLC I Amended and Restated Limited Liability Company Agreement (the "LLC Agreement"), the AllianzGI Structured Alpha Multi-Beta Series LLC I – US Fixed Income Series Confidential Private Placement Memorandum (the "PPM"), and the Structured Alpha Multi-Beta Series LLC I Subscription Agreement (the "Subscription Agreement").

39.     Under the PPM, for example, Allianz accepted the duties applicable to a fiduciary under ERISA—the highest duties known to the law—whenever the Series constituted "plan assets" under the statute.  The Series constituted plan assets at all relevant times because, as the PPM recognizes, "all (or substantially all) of the investors in the Series will be benefit plan investors."  At all relevant times, then, Allianz agreed to be "subject to the obligations and liabilities imposed on fiduciaries by ERISA."  Even if the Series somehow did not constitute plan assets, Allianz promised to "use its best efforts to discharge its duties consistent with the standard of care imposed on fiduciaries under ERISA."  Allianz owed fiduciary duties of care and loyalty to investors in the Series regardless of whether they were plans governed by ERISA.

40.     Under the LLC Agreement, moreover, Allianz accepted appointment as a fiduciary "investment manager of the Fund and each Series."  Allianz's responsibilities as investment manager included "advising regarding the purchase and sale of investments," "arranging financing for the acquisition of investments and other assets," "conducting, or supervising third parties who conduct, investigations of investments," and "managing the assets of the Fund and each Series."

41.     The LLC Agreement also provides that Allianz may be liable to the Association for losses sustained by the Series or its investors "arising from" Allianz's "bad faith, willful misconduct or negligence."

**Allianz Reiterates Structured Alpha's Risk-Managed Strategy**

42.     In February 2018, Structured Alpha underperformed relative to its beta benchmarks.  The short-term investment losses were recouped in the following months, in accordance with how Allianz had said the strategy would work in a market downturn.

43.     Nevertheless, the Association's chief financial officer sought to reevaluate the Structured Alpha strategy.  So did his colleagues on the NEBC, which requested in April 2018 that Allianz explain how the strategy would perform in a worst-case market scenario.

44.     Investment staff at the Association contacted Allianz about the NEBC's request. Allianz responded with written representations about how Structured Alpha would work and how it would protect against the risk of losses in market declines.  The Association's investment staff understood that Allianz's representations about the strategy applied to all Structured Alpha investments the staff oversaw, including the Association's investments in the Series.  Allianz, for its part, knew that this was how its representations were being received.

45.     Allianz proclaimed in its response that Structured Alpha's hedge positions were the "cornerstone" of the strategy.  Echoing representations Allianz had made previously to the Association, Allianz promised that these hedges would be "in place at all times, exclusively for risk-management purposes" in order "to protect the portfolio in the event of a market crash." Allianz emphasized that this "tail-risk protection" included "both hedging primarily for a single-day market crash" and "protection in the event of multi-day or multi-week significant declines."

46.     But Allianz went even further in describing the hedging positions.  According to Allianz's written response, Structured Alpha's hedging strategy *eliminated* the risk of an "ill-timed margin call," a common concern among investors in options strategies and a particular concern of the Association's.  "*We do not have this risk*," Allianz touted, because of Structured Alpha's "hedging positions."  Allianz claimed further that the lack of margin-call risk was a "key

benefit of our hedging positions."  These statements were consistent with representations Allianz had made elsewhere about the strategy's supposed immunity to margin calls.  For instance, in an April 2017 pamphlet, Allianz proclaimed that "***under no scenario*** can an equity-market decline cause our portfolio to experience a margin call, a crucial differentiator from many option strategies."

47.     Allianz's written response contained several other critical representations about how Allianz managed the Structured Alpha strategy.  For example, Allianz emphasized that it would need only "between 10% and 20%" of the beta investment for collateral for the alpha component, suggesting that only a small portion of investor money was potentially at risk in a market decline.  Allianz also touted "the proprietary tools and models we have built over many years of research and development" that Allianz claimed allowed it "to stress-test the entire portfolio for ***any*** market scenario."  These tools, Allianz claimed, enabled it to protect investors' assets from "two risks: the overnight market crash and the multi-week market correction."  And as for the "worst-case drawdown scenario," Allianz represented that its lower-target strategy "could be expected to deliver short-term underperformance of 100 to 300 basis points," *i.e.*, underperformance of only 1% to 3% relative to the benchmark.

48.     Elsewhere, Allianz downplayed even that risk by explaining that the period of increased volatility that typically accompanies a market downturn would provide an attractive environment in which to deploy its options strategy.  It claimed that any short-term underperformance would be recouped in a rebound once the initial downturn had been weathered.  Allianz's claim, of course, assumed that the investments would in fact survive the market downturn.

**Allianz Promises to Deploy a New Hedging Strategy to Further Manage Risk**

49.     Structured Alpha underperformed again relative to its beta benchmarks in December 2018.  And again those losses were recouped in the ensuing months, as Allianz had said could be expected in the event Structured Alpha sustained a loss.

50.     In response to the underperformance, Allianz vowed to implement a new hedging configuration to better protect the options portfolio and guard against costly restructuring when equity markets experience steep declines.

51.     In an April 2019 presentation, Allianz explained that the gist of the "newly developed configuration" was to purchase fewer hedges but buy them closer to the money when building positions in a low-VIX environment.  By doing so, Allianz claimed it would "create *self-hedged* range-bound spreads with a ***defined maximum loss***."  Thus, rather than restructure short positions, as Allianz had at times done when markets fell in the past, Allianz would now leave the new-configuration positions alone—they would become "hands-free" and require "no intervention."

52.     Allianz included a diagram representing that the "tactical shift" in its hedging positions would create a defined "Max Loss" for the portfolio:

15



These new "sealed" spreads, Allianz claimed, would "Improve[] the portfolio's ability to navigate difficult V-shaped equity and volatility moves" and "Better equip[] the portfolio to handle sharp moves that begin in low-volatility environments."  According to Allianz, the new configuration was the product of "almost two years" of research and development.

53.     In a quarterly update Allianz provided to the Association at the end of September 2019, Allianz hailed the new hedging strategy's early successes: "The S&P 500's correction in early August provided a second successful test case, in addition to the May experience, for the new hedging configuration that we began implementing this year."  These results demonstrated, according to Allianz, "our improved ability to navigate sharp market declines that are preceded by low-volatility environments."

54.     Allianz made additional representations to the Association about Structured Alpha in 2019.  For example, Allianz summarized the strategy as pursuing "risk-managed returns." "Risk is continuously managed and monitored," Allianz claimed, "at both the portfolio level by the investment team and the firm level."  On the subject of "Leverage," Allianz emphasized that it engaged in "No borrowing."  And Allianz repeated aspects of its investment philosophy that it claimed to follow, including the mantras "Never make a forecast on the direction of equities or volatility" and "Prepare for the unexpected; pre-develop plans in anticipation of scenarios in which the portfolio could be at risk for losses":



55.     Based on Allianz's representations, the Association reasonably understood that Allianz was not selling "naked" options, *i.e.*, options without any corresponding hedge in place. Rather, Allianz indicated that for every option it sold, Allianz bought a corresponding hedge as

"reinsurance" to limit the risk of loss in case the market dropped.  Allianz led the Association to believe that the hedging positions placed to protect against downside losses would be appropriately matched to the risk-bearing positions (*i.e.*, they would "reinsure" the same risk) and that Allianz would never sell any "naked" options.  That belief was false.

**Allianz Abandons the Risk-Managed Investment Strategy**
**It Had Represented to the Association**

56.     Allianz often touted its supposed fidelity to Structured Alpha's stated investment strategy.  For instance, in one quarterly update on the Association's investments, Allianz congratulated itself for its "willingness to be flexible ***without straying from our investment philosophy***," saying this was one of its "biggest strengths," and emphasized that "part of staying true to Structured Alpha's investment philosophy is ***maintaining the risk profile of our option portfolio***."  Going further still, Allianz claimed that it managed Structured Alpha to "***preserv[e] our risk objectives even at the expense of outperformance***."

57.     Yet by at least 2019, Allianz had abandoned the investment strategy it professed to follow.  Rather than "maintain[] the risk profile" it had promised, Allianz was taking reckless actions that added excess and undisclosed risk to the portfolio—in effect, leaving the portfolio unhedged in certain market scenarios and placing a directional bet against market volatility—in hopes of chasing additional returns, all unbeknownst to the Association.

58.     Juicing the strategy's returns would increase Allianz's fees.  Allianz did not charge a management fee to operate Structured Alpha.  Rather, Allianz received 30% of any gains relative to the Series' benchmark index.  If Allianz underperformed, it received nothing.

59.     One example of Allianz's recklessness was its decision to purchase hedging puts further out of the money than Allianz had said it would.  Allianz claimed time and again that its long puts would be struck "-10% to -25%" below the market.  When Allianz diagrammed the

hedging component in presentations about Structured Alpha, it depicted a hedge at the bottom end of that range—25% below the market—even in the "original configuration" where (unlike in the "new configuration") the long puts were expected to be further out of the money.

60.     In fact, Allianz was purchasing hedging puts that were significantly further out of the money than Allianz had represented they would be.  Those puts were cheaper and therefore less of a drag on the fee-generating returns Allianz could hope to produce.  By purchasing cheap puts that were far out of the money, Allianz could inflate profits from its range-bound and directional spreads, thereby increasing Allianz's fees, and still claim that it was buying hedges (though those hedges had the potential to be virtually worthless in certain market scenarios when they would be most needed).  But the gulf between Allianz's offensive, premium-generating positions and its defensive ones left the portfolio effectively unhedged and exposed the Association's investments to potential losses far beyond those Allianz had presented as possible.

61.     Another example of Allianz's recklessness was its decision to buy hedging puts that expired sooner than the risk-bearing options it sold.  Allianz had represented that the long puts would be of the same or similar duration as the short puts.

62.     In reality, the puts Allianz was purchasing as supposed "reinsurance" expired far earlier than many of the puts it was selling, meaning there was, as Allianz later admitted, a "duration mismatch" between the options Allianz was short and those it was long.  Allianz bought these shorter-dated puts because, again, they were cheaper.  By purchasing less expensive, shorter-dated puts and selling more expensive, longer-dated puts, Allianz essentially bought less "reinsurance" than it had promised.  Doing so allowed Allianz to increase the profits from its range-bound and directional spreads, thereby increasing Allianz's fees.

63.     Again, Allianz departed from the strategy it had represented to the Association and, in doing so, Allianz layered excess and undisclosed risk on the portfolio.  Allianz was apparently betting that it would be able to effectively replace the hedges as they expired, even in a declining market.  That bet left the portfolio exposed to the risk that in a deteriorating market Allianz would be unable to backfill the hedges it should have had in place all along.

64.     Perhaps the most glaring example of Allianz's recklessness, however, was its decision not to acquire any hedges for the return-generating options it sold on volatility indexes. In addition to buying and selling options on an equity index like the S&P 500, Allianz also disclosed that as part of the Structured Alpha strategy it may buy and sell options on volatility indexes such as the VIX or the iPath Series B S&P 500 VIX Short-Term Futures ETN ("VXX"). Because these options would be part of the return-generating portions of the strategy (and introduce risk as a result), they would also need to be appropriately hedged.  In the same way that Allianz bought long puts on the S&P 500 to hedge against a decline in the equity markets, it would need long positions on the VIX to hedge properly against a spike in volatility.

65.     Allianz, however, was taking on the risk of selling VIX options without buying any corresponding hedge.  To borrow Allianz's analogy, it was selling insurance against market volatility without any reinsurance against the risk that entailed.  Far from "never" making a forecast on the direction of volatility—a supposed pillar of the Structured Alpha investment philosophy, according to Allianz—Allianz was gambling that the VIX would remain relatively low so its unhedged short positions would not be exposed to catastrophic losses.

66.     Allianz was making that bet despite knowing that the VIX was becoming increasingly sensitive to market movements.  In a December 2019 quarterly update to the Association, Allianz claimed that the recent "sensitivity of the VIX" was "advantageous" for

Structured Alpha.  A "typical response," Allianz explained, "is for the VIX to rise 10 to 20 times

more than the S&P 500 declines."  But in early December 2019, Allianz observed a VIX increase

"100 times larger than the index move."  Even though Allianz had identified that the VIX was

becoming prone in late 2019 and early 2020 to sudden, larger-than-expected increases, Allianz

continued to short volatility options—betting that the VIX would remain relatively low—without

any corresponding long positions to hedge against a spike in the VIX.

67.     In all cases—whether purchasing puts too far out of the money or purchasing puts

with shorter expiration dates than the puts it sold or shorting the VIX without any corresponding

hedge in place—Allianz's motivation was self-interest, not the benefit of Fund members like the

Association.  And in all cases, Allianz had departed from the prudent strategy it had represented

to the Association, adding excess and undisclosed risk out of line with the risk parameters

Allianz had pledged to follow.

68.     The Association did not know that, going into the market dislocation of February

and March 2020, Allianz had departed from its professed investment strategy and was instead

layering excess risk into the Fund and the Series.  The strategy seemed to have been performing

as Allianz said it would, with any short-term losses being recovered in subsequent months.  And

Allianz represented that the portfolio was, if anything, better positioned to handle a market

downturn than it had been in the past.

69.     The most significant modification to the Structured Alpha investment strategy that

Allianz had brought to the Association's attention was one that purportedly ***enhanced*** the

portfolio's ability to navigate a market decline.  In its communications to the Association in

2019, Allianz touted its "new configuration" hedges, which Allianz said gave the portfolio an

"improved ability to navigate sharp market declines that are preceded by low-volatility

environments" and "made the option portfolio more resilient."  Although it trumpeted this
"refinement[]," Allianz did not tell the Association of its other changes to Structured Alpha's
investment strategy—namely, that it was making a directional bet that volatility would remain
low, selling naked options, and buying hedges much further below the market than it should have
under its professed investment strategy.

70.     These and other reckless actions by Allianz would lead the Association to suffer
severe investment losses in early 2020.

**Allianz's Breaches Cause the Association's Investments Severe Losses**

71.     Going into the market turmoil of February and March 2020, Allianz had told
investors that it was "as prepared as ever in the event of a severe market dislocation."  Yet
Allianz did not have in place appropriate hedging positions to protect the portfolio (as it claimed
it would) and then it sold many of the hedges it did have (as it claimed it would not do).

72.     Throughout January and into late February 2020, the VIX remained relatively low
and the S&P 500 remained relatively stable before the market began to decline and volatility
spiked in the second half of February and March 2020:





73.     By early March, the Association's investments in Structured Alpha had already declined by a double-digit percentage.  Yet in communications with investment staff at the Association, Allianz reported optimism about the portfolio's ability to rebound.  Although Allianz acknowledged that some restructuring had taken place, it reported that the "cost of these moves was well contained."

74.     Contrary to the rosy picture Allianz was painting, the Association's investments were plummeting.  On March 12, Allianz reported on a phone call with investment staff at the Association that the hedges—the "reinsurance" that Allianz had said would be in place "at all times" to protect the portfolio—were "not working."  Allianz also reported that the investments would soon face a margin call, the very risk that Allianz had told investors it would never face. ("We do not have this risk," Allianz had represented.)

75.     The next morning, Friday, March 13, Allianz emailed Aon Investments USA Inc. ("Aon"),[3] the NEBC's fiduciary investment adviser, with additional details about the strategy's collapse.  Those details revealed that Allianz had added excess and undisclosed risk to the portfolio in February and March 2020 and that it had been making other reckless decisions, unbeknownst to the Association, for some time.

76.     If Allianz had been managing the portfolio in the manner it claimed it would, Allianz would have (among other things) constructed the hedging positions closer to the market and left those hedges in place to secure a defined "Max Loss" if the market declined.  That was the "new configuration" strategy—touted as the product of "almost two years" of research and development—that Allianz had promised to deploy in a low-VIX environment like the one that existed for the first six weeks of 2020.

---

[3] At the time, Aon was known as Aon Hewitt Investment Consulting, Inc.

77.     Yet, as Allianz acknowledged in its March 13 email, it had sold the new-configuration hedges—*i.e.*, the hedges that were supposed to be "hands-free" and locked in to contain potential losses.  According to Allianz, it had struck the puts "7% to 9%" out of the money.  But when the market declined, these "new-configuration puts were shifted," meaning Allianz sold them and replaced them with long puts much further out of the money.  Allianz, as Aon later put it, chose not to "accept modest losses and aim to recover in a reasonable time period," opting instead to gamble that the market would rebound immediately and "expos[ing] the portfolio to further downside risk."  "In hindsight," Allianz admitted, "***we should have left those positions as is***."

78.     Allianz would not have sold the new-configuration hedges were it acting for the benefit of Fund members such as the Association.  Were it doing so, it would have accepted modest losses.  Instead, motivated by the fact that it would earn no compensation until those losses were recovered, Allianz removed the hedge that was supposed to protect the Association's investments and gambled (with the Association's money) that markets would soon recover.  In doing so, Allianz abandoned not only Structured Alpha's supposed hedging strategy but also its purported tenet not to bet on the direction of the market.

79.     As Allianz acknowledged in its March 13 email, these active management decisions also created a "duration mismatch" between the short and long puts that contributed to the portfolio's losses.  This mismatch, Allianz explained, meant that the long puts "couldn't be harvested because they were shorter-dated" and about to expire.  The resulting "theta decay reduced their value," and the puts "did not pay out."  Another problem was that the cost to replace the expiring long puts increased dramatically as the market declined and volatility spiked.  "We are continually rolling into new long puts as they expire," Allianz wrote, "but there

still is a duration mismatch that causes a continued equity decline / vol increase to hurt the mark and vice versa." Had Allianz purchased and maintained the proper downside protection that it had represented would be in place at all times, it would have had no need to replace expiring long puts at the critical time when, as Aon later put it, they became "prohibitively expensive."

80.     In addition to what Allianz admitted to in its March 13 email, at least two other reckless decisions by Allianz inserted excessive risk into the portfolio and contributed to the collapse of the Association's investments.

81.     First, Allianz had been chasing additional returns by purchasing cheap long puts much further out of the money than Allianz had represented. Many of those long puts, Aon reported after the fact, "expired worthless in early March." As Aon explained when asked later why the hedges proved ineffective, "they were too far 'out of the money' to begin with."

82.     Second, though Allianz was selling puts and calls on volatility indexes like the VIX, Allianz had purchased *no* long positions on the volatility indexes it was shorting. Allianz left the portfolio at the mercy of a surge in volatility, which is exactly what happened in February and March 2020.

83.     Allianz left these short positions "naked" even though it knew that the VIX had been displaying increased "sensitivity" to market moves and was therefore prone to sudden, larger-than-anticipated spikes. The net result was that the portfolio, going into the volatility spikes of February and March 2020, was *short* volatility—reflecting Allianz's gamble that the VIX would remain relatively low. Allianz made this careless directional bet despite the supposed pillar of its investment strategy that it would "never make a forecast on the direction of equities or volatility."

84.     The combination of these and other reckless actions by Allianz caused the Association's investments in the Series to suffer significant losses by the time the market opened on Monday, March 16.  After Allianz notified investment staff at the Association that the portfolio was facing a margin call the next day, there was no choice but to liquidate the investments to protect what was left.

85.     Allianz lost about $46 million of the Association's money—roughly two-thirds the value of its investments—in a matter of weeks.  These losses far exceed those incurred by the Series' fixed income benchmark index, the bond markets more generally, and comparable investment strategies in which the Association could have invested.

## Allianz Attempts to Whitewash Its Breaches

86.     On July 20, 2020, Allianz published on its website the results of an internal review Allianz claims to have conducted into the "substantial losses" Structured Alpha incurred. The stated purpose of Allianz's review, titled "Structured Alpha March 2020 performance," was "to better understand how the Portfolio's investment and risk management processes operated in the face of the market volatility" experienced at that time.

87.     Allianz's account purports to describe certain of its actions in March 2020. "During the eleven trading days between March 2 and March 16," Allianz says, "there were at least four instances" in which it restructured the short puts on the S&P 500 "by both reducing the strike prices of the put options and by decreasing the number of positions held."  "Similarly, the portfolio managers replaced short-term short VIX calls with new longer-term short VIX calls at more distant strike prices.  An analogous process occurred for short VXX calls," according to Allianz.  But "commencing on March 12, 2020, the Portfolio Management team stopped relayering new short puts on the [S&P 500] and [Nasdaq], and short calls on the VIX and VXX to further reduce the risks in the portfolio."

88.     These details confirm that Allianz was betting on a market rebound by continuing to relayer short positions during the critical time period when Allianz should have been mitigating risk, not compounding it.  What is new in this account, however, is Allianz's admission that it was relayering risk-bearing positions all the way until March 12.  Only then did Allianz stop exposing the portfolio to further losses by refraining from selling more insurance against an additional market decline.

89.     Allianz claims in its July 2020 report that it was "obligat[ed] to investors to pursue returns" in the first half of March 2020 rather than "convert[] to cash."  But Allianz was not obligated to layer additional risk into the portfolio so it could bet on a market rebound.  Allianz could have, for example, converted to cash or cash equivalents (as it had discretion to do under the PPM), an especially appropriate action to assist in the preservation of capital on a temporary basis.  Allianz knew this.  According to Tournant's May 2016 interview, Allianz always had three options when it came to restructuring, one of which was to "get out of the positions" altogether.

90.     The most jarring aspect of Allianz's July 2020 report is how dramatically the strategy Allianz now describes differs from the strategy it had represented to the Association all along.

91.     Allianz's report claims that the risks of investing in Structured Alpha were "fully disclosed, including the risk of total loss."  That assertion contradicts Allianz's prior representations of how it would manage the portfolio to avoid significant losses.  It also contradicts Allianz's specific representation to the Association and others that one "key benefit" of the hedges was that they eliminated all risk of a margin call.

92.     Allianz's report also claims that the hedges were designed to offer only "some protection" in the event of a market crash.  The hedges, Allianz now insists, were "not intended to provide broader protection against all market downturns, particularly downturns that transpire over longer periods of time."  Rather, they were "deliberately constructed with options that were both of relatively short expiration and far out of the money" only to "protect against a ***one-day market shock***."

93.     Allianz never disclosed these limitations.  To the contrary, Allianz characterized the hedges as "reinsurance" that would be "in place at all times" in order to "protect the portfolio in the event of a market crash."  It emphasized that its investment strategy addressed "two risks: the overnight market crash ***and the multi-week market correction***."  Allianz's "tail-risk protection," it told investors, "includes both hedging primarily for a single-day market crash as well as better ***protection in the event of multi-day or multi-week significant declines***."  Allianz bolstered these claims about protection against multi-week declines with stress testing purporting to show, for instance, that the strategy would yield positive returns during market shocks that took weeks or even months to transpire.  Allianz's after-the-fact description of the hedges as a partial backstop—protecting only against a "one-day market shock" but nothing else—is inconsistent with its prior representations.

94.     Allianz's July 2020 report claims that because the hedges were constructed to protect only "against a one-day market shock," Allianz properly "mitigated" portfolio risk through restructuring.

95.     Yet Allianz had told the Association that when it was building positions in a low-VIX environment (like that which existed at the start of 2020), the new-configuration hedges not only would protect against a market decline but would predefine a set "maximum loss."

According to Allianz, these new-configuration hedges were supposed to create "hands-free spreads" that would need *no restructuring* during "the life of the position."  Allianz's July postmortem omits any mention of the new-configuration hedges that should have been locked in place to define a "Max Loss."

96.     Allianz's July 2020 report claims further that Allianz's "Enterprise Risk Management function" stress tested the portfolio against "*single day* scenarios" only.

97.     If single-day stress testing were all Allianz was doing, its negligence speaks for itself: such testing would not permit Allianz to evaluate, let alone manage, risk in a multi-day or multi-week market decline.  Contrary to Allianz's July 2020 report, Allianz had previously assured that the same "Enterprise Risk Management" team was responsible for "weekly risk profiles" and that Allianz's "proprietary tools and models" enabled it to "stress-test the entire portfolio for *any* market scenario"—models Allianz claimed were "integral to the successful day-to-day management of Structured Alpha."  And when asked about potential worst-case scenarios, Allianz responded:

> We *continually focus* on two risks: the overnight market crash and *the multi-week market correction*.  Our ongoing *objective is to protect the profit/loss profile of the option portfolio across a broad set of stress-test parameters*.  We manage the option portfolio for its ability to withstand and *navigate as wide a range of potential market scenarios* as possible.

Again, Allianz's postmortem is inconsistent with the risk profile of Structured Alpha that Allianz disclosed to the Association and its investment staff.

98.     Allianz also included in its July 2020 report a graph providing a "representative depiction of a portion of the composition" of one of the Structured Alpha funds as of "February 2020":



**Example of payoffs by strategy in the Structured Alpha 1000 Fund for S&P 500 options**
February 2020

99.     This graph depicts an investment strategy that is inconsistent with the one Allianz assured the Association it would follow to pursue "risk-controlled returns."  Allianz never disclosed this graph—or anything like it—to the Association before Structured Alpha's disastrous results in 2020.  If it had, the Association would not have maintained its significant investments in Structured Alpha.

100.     Allianz's July 2020 graph illustrates that Allianz bought downside hedges well beneath the strike price at which it said it would buy hedges (*i.e.*, "-10% to -25%" below the market).  While Allianz inexplicably claims this was "deliberate[]," its failure to buy the hedges it promised added excess risk to the portfolio, leaving the Fund and the Series exposed to the severe losses that occurred in February and March 2020.

101.     Allianz's July 2020 graph also illustrates the absence of any new-configuration hedges, *i.e.*, the hedges that Allianz said it would buy closer to market levels in order to lock in a "Max Loss" in the case of a market decline.  These are nowhere to be found in Allianz's graph (just as all discussion of them is missing from Allianz's commentary), although Allianz had said

it had "successful[ly]" deployed this "refinement" to its investment strategy to make the portfolio "more resilient" to market declines.

102. Allianz's July 2020 graph also shows that potential returns from the options strategy (illustrated in blue in the annotated version of Allianz's graph below) came at the cost of potentially massive, unhedged losses (illustrated in red below) if the market declined. The downside exposure depicted in Allianz's July 2020 chart is contrary to Allianz's description of Structured Alpha's investment strategy to the Association, including its representation that the hedging positions eliminated all risk of a margin call.



103. Importantly, Allianz's graph depicts only equity index options on the S&P 500. In its July 2020 report, Allianz chose not to illustrate the strategy "payoffs" from the short volatility options it sold on the VIX and VXX in violation of its promise "never" to make a bet on the direction of volatility. Had it included a graph of that strategy, it would have shown the potential for limited, modest payoffs if Allianz bet correctly and ***unlimited*** losses if it did not.

Allianz has offered no explanation for why it made that wager with the Association's money or how the disastrous losses it caused as a result were consistent with the "risk-controlled" investment strategy Allianz claimed to pursue.

## COUNT I: BREACH OF FIDUCIARY DUTY

104.    The Association restates and realleges paragraphs 1-103 as though fully set forth herein.

105.    Allianz, a registered investment adviser under the Investment Advisers Act of 1940, served as managing member and investment manager of the Fund, a Delaware limited liability company.  Allianz was responsible for the general management of the investment portfolios of the Fund, the Series, and each other series in the Fund.

106.    A fiduciary relationship therefore arose between Allianz and the Association—an investor in and member of the Fund—such that Allianz owed fiduciary duties of care and loyalty to the Association.

107.    Allianz also agreed to act as a fiduciary.  In the PPM, for example, Allianz promised to be "subject to the obligations and liabilities imposed on fiduciaries by ERISA," including duties of care and loyalty, if the Series was treated as "plan assets" under the statute. Even if it was not, Allianz pledged to "use its best efforts to discharge its duties consistent with the standard of care imposed on fiduciaries under ERISA."

108.    Allianz's fiduciary duty of care required it to discharge its responsibilities managing the Fund and the Series with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

109.   Allianz's fiduciary duty of loyalty required it to discharge its responsibilities managing the Fund and the Series with utmost good faith and for the benefit of the Association.

110.   The Association reposed trust and confidence in Allianz to serve prudently and in good faith as managing member and investment manager of the Fund, which trust and confidence Allianz accepted.

111.   Allianz breached its fiduciary duties.  Allianz's breaches include, without limitation, the following:

(a)   Allianz breached its duties to prudently manage the Fund and the Series or manage them in good faith and for the benefit of the Association when it did not put the appropriate hedges in place to protect the Association's investments during a market decline. This failure added excess and undisclosed risk and was contrary to the representations Allianz had made to the Association and others that the hedges would be in place "at all times" as "reinsurance" for the portfolio.

(b)   Allianz breached its duties to prudently manage the Fund and the Series or manage them in good faith and for the benefit of the Association when it sold the new-configuration hedges and took on new risk-bearing positions starting in late-February 2020. These discretionary restructurings exposed the Association's investments to further downside risk and were contrary to Allianz's representations, including that it would not sell the new-configuration hedges that should have been locked in to safeguard the Association's investments.

(c)   Allianz breached its duties to prudently manage the Fund and the Series or manage them in good faith and for the benefit of the Association when it represented that it had constructed the portfolio in a way that would ensure a defined "Max Loss" and then managed the strategy in a way that exposed the Association's investments to unlimited losses.

(d)     Allianz breached its duties to prudently manage the Fund and the Series or manage them in good faith and for the benefit of the Association when it either failed to have adequate risk management measures in place or abandoned such measures.

(e)     Allianz breached its duties to prudently manage the Fund and the Series or manage them in good faith and for the benefit of the Association when it represented that it would manage the Structured Alpha strategy in such a way to eliminate the risk of margin calls yet implemented a strategy in which that very risk materialized.

(f)     Allianz breached its duties to prudently manage the Fund and the Series or manage them in good faith and for the benefit of the Association when, unbeknownst to the Association, Allianz decided to purchase puts that were further out of the money than the maximum range Allianz had disclosed, thus adding excess and undisclosed risk to the Association's investments, in an apparent effort to increase Allianz's fees.

(g)     Allianz breached its duties to prudently manage the Fund and the Series or manage them in good faith and for the benefit of the Association when, unbeknownst to the Association, Allianz decided to purchase puts that expired sooner than the puts it sold.  This practice was contrary to Allianz's representations that the short and long positions would be of relatively equal duration, and it added excess and undisclosed risk to the Association's investments.  Allianz created this "duration mismatch" not for the benefit of the Association, but because doing so allowed Allianz to enhance its fees.

(h)     Allianz breached its duties to prudently manage the Fund and the Series or manage them in good faith and for the benefit of the Association when, unbeknownst to the Association, Allianz decided to sell volatility index options without buying any corresponding

hedge, adding excess and undisclosed risk to the Association's investments, again in an apparent effort to enhance its fees.

(i)     Allianz breached its duties to prudently manage the Fund and the Series or manage them in good faith and for the benefit of the Association when it caused the Association to believe that Structured Alpha's risk profile was consistent with Allianz's stated investment strategy rather than the actual risk profile, either by making false or misleading representations about Structured Alpha or failing to disclose information necessary to correct prior representations that were inconsistent with how Allianz was actually managing the strategy.

(j)     Allianz breached its duties to prudently manage the Fund and the Series or manage them in good faith and for the benefit of the Association when it operated a strategy that was unduly weighted towards being short volatility in February and March 2020 (contrary to its pledge not to make directional bets) and created excess and undisclosed correlated risks to the Association's investments.

112.    As a direct and proximate result of Allianz's breaches of fiduciary duty, the Association sustained actual damages, with the exact amount to be proven at trial.

## COUNT II: BREACH OF CONTRACT

113.    The Association restates and realleges paragraphs 1-112 as though fully set forth herein.

114.    The Association's investments in the Fund and the Series were subject to the PPM, the LLC Agreement, and the Subscription Agreement (collectively, the "Fund Agreements").

115.    The Association and Allianz are parties to the Fund Agreements.

116.    The Fund Agreements are valid and enforceable contracts.

117.    The Association has performed its obligations under the Fund Agreements.

118.    Under the Fund Agreements, Allianz promised, among other things, to comply with "the obligations and liabilities imposed on fiduciaries by ERISA," including the duties of care and loyalty.  In this regard, Allianz agreed to manage the Fund and the Series prudently and for the benefit of the Association.

119.    By executing the Fund Agreements, Allianz agreed further to maintain "structural risk protections" in the Fund and the Series to safeguard the Association's assets.

120.    In addition, Allianz promised under the Fund Agreements to give notice to the Association of any amendments to the LLC Agreement that reasonably could be expected to have a "material adverse effect" on the Fund or the Association.

121.    Allianz breached its obligations under the Fund Agreements.  Allianz's breaches include, without limitation, the following:

(a)    Allianz breached its contractual duties to the Association when it did not put the appropriate hedges in place to protect the Association's investments during a market decline.  This failure added excess and undisclosed risk and was contrary to the representations Allianz had made to the Association and others that the hedges would be in place "at all times" as "reinsurance" for the portfolio.

(b)    Allianz breached its contractual duties to the Association when it sold the new-configuration hedges and took on new risk-bearing positions starting in late-February 2020.  These discretionary restructurings exposed the Association's investments to further downside risk and were contrary to Allianz's representations, including that it would not sell the new-configuration hedges that should have been locked in to safeguard the Association's investments.

(c)      Allianz breached its contractual duties to the Association when it represented that it had constructed the portfolio in a way that would ensure a defined "Max Loss" and then managed the strategy in a way that exposed the Association's investments to unlimited losses.

(d)      Allianz breached its contractual duties to the Association when it either failed to have adequate risk management measures in place or abandoned such measures.

(e)      Allianz breached its contractual duties to the Association when it represented that it would manage the Structured Alpha strategy in such a way to eliminate the risk of margin calls yet implemented a strategy in which that very risk materialized.

(f)      Allianz breached its contractual duties to the Association when, unbeknownst to the Association, Allianz decided to purchase puts that were further out of the money than the maximum range Allianz had disclosed, thus adding excess and undisclosed risk to the Association's investments, in an apparent effort to increase Allianz's fees.

(g)      Allianz breached its contractual duties to the Association when, unbeknownst to the Association, Allianz decided to purchase puts that expired sooner than the puts it sold.  This practice was contrary to Allianz's representations that the short and long positions would be of relatively equal duration, and it added excess and undisclosed risk to the Association's investments.  Allianz created this "duration mismatch" not for the benefit of the Association, but because doing so allowed Allianz to enhance its fees.

(h)      Allianz breached its contractual duties to the Association when, unbeknownst to the Association, Allianz decided to sell volatility index options without buying any corresponding hedge, adding excess and undisclosed risk to the Association's investments, again in an apparent effort to enhance its fees.

(i)     Allianz breached its contractual duties to the Association when it caused the Association to believe that Structured Alpha's risk profile was consistent with Allianz's stated investment strategy rather than the actual risk profile, either by making false or misleading representations about Structured Alpha or failing to disclose information necessary to correct prior representations that were inconsistent with how Allianz was actually managing the strategy.

(j)     Allianz breached its contractual duties to the Association when it operated a strategy that was unduly weighted towards being short volatility in February and March 2020 (contrary to its pledge not to make directional bets) and created excess and undisclosed correlated risks to the Association's investments.

(k)     Allianz breached its contractual duties to the Association when it failed to have or maintain structural risk protections in place and failed to purchase and maintain hedges that would afford such protection to the portfolio.

(l)     Allianz breached its contractual duties to the Association when it altered the Fund's investment strategy to add excess and undisclosed risk without advance notice to the Association.

122.    The Fund Agreements provide that Allianz may be liable to the Association for losses sustained by the Series or its investors "arising from" Allianz's "bad faith, willful misconduct or negligence."  Allianz's mismanagement of the Fund and the Series was at least negligent.

123.    As a direct and proximate result of Allianz's breaches of the Fund Agreements, the Association sustained actual damages, with the exact amount to be proven at trial.

## COUNT III: NEGLIGENCE

124.    The Association restates and realleges paragraphs 1-123 as though fully set forth herein.

125.    Allianz, a registered investment adviser under the Investment Advisers Act of 1940, served as managing member and investment manager of the Fund, a Delaware limited liability company.  Allianz was responsible for the general management of the investment portfolios of the Fund, the Series, and each other series in the Fund.

126.    The Association was an investor in and member of the Fund.

127.    Allianz therefore owed a duty of care to the Association.  That duty required Allianz to discharge its responsibilities managing the Fund and the Series with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

128.    In addition, the Fund Agreements provide that Allianz may be liable to the Association for losses sustained by the Series or its investors "arising from" Allianz's "bad faith, willful misconduct or negligence."

129.    Allianz breached its duty to the Association to exercise reasonable care in managing the Association's investments in the Series.  Allianz's breaches include, without limitation, the following:

(a)     Allianz breached its duty of reasonable care when it did not put the appropriate hedges in place to protect the Association's investments during a market decline. This failure added excess and undisclosed risk and was contrary to the representations Allianz had made to the Association and others that the hedges would be in place "at all times" as "reinsurance" for the portfolio.

(b)     Allianz breached its duty of reasonable care when it sold the new-configuration hedges and took on new risk-bearing positions starting in late-February 2020. These discretionary restructurings exposed the Association's investments to further downside risk and were contrary to Allianz's representations, including that it would not sell the new-configuration hedges that should have been locked in to safeguard the Association's investments.

(c)     Allianz breached its duty of reasonable care when it represented that it had constructed the portfolio in a way that would ensure a defined "Max Loss" and then managed the strategy in a way that exposed the Association's investments to unlimited losses.

(d)     Allianz breached its duty of reasonable care when it either failed to have adequate risk management measures in place or abandoned such measures.

(e)     Allianz breached its duty of reasonable care when it represented that it would manage the Structured Alpha strategy in such a way to eliminate the risk of margin calls yet implemented a strategy in which that very risk materialized.

(f)     Allianz breached its duty of reasonable care when, unbeknownst to the Association, Allianz decided to purchase puts that were further out of the money than the maximum range Allianz had disclosed, thus adding excess and undisclosed risk to the Association's investments, in an apparent effort to increase Allianz's fees.

(g)     Allianz breached its duty of reasonable care when, unbeknownst to the Association, Allianz decided to purchase puts that expired sooner than the puts it sold.  This practice was contrary to Allianz's representations that the short and long positions would be of relatively equal duration, and it added excess and undisclosed risk to the Association's investments.  Allianz created this "duration mismatch" not for the benefit of the Association, but because doing so allowed Allianz to enhance its fees.

(h)     Allianz breached its duty of reasonable care when, unbeknownst to the Association, Allianz decided to sell volatility index options without buying any corresponding hedge, adding excess and undisclosed risk to the Association's investments, again in an apparent effort to enhance its fees.

(i)     Allianz breached its duty of reasonable care when it caused the Association to believe that Structured Alpha's risk profile was consistent with Allianz's stated investment strategy rather than the actual risk profile, either by making false or misleading representations about Structured Alpha or failing to disclose information necessary to correct prior representations that were inconsistent with how Allianz was actually managing the strategy.

(j)     Allianz breached its duty of reasonable care when it operated a strategy that was unduly weighted towards being short volatility in February and March 2020 (contrary to its pledge not to make directional bets) and created excess and undisclosed correlated risks to the Association's investments.

130.    As a direct and proximate result of Allianz's negligence, the Association sustained actual damages, with the exact amount to be proven at trial.

**PRAYER FOR RELIEF**

The Association requests that the Court enter judgment in its favor against Allianz and an Order granting the following relief:

A.      A money judgment in an amount exceeding $75,000, with the exact amount to be proven at trial;

B.      An order awarding pre- and post-judgment interest to the Association; and

C.      Any such other legal and equitable relief as this Court may deem just and proper.

## JURY DEMAND

The Association demands a jury trial on all issues so triable.  *See* Fed. R. Civ. P. 38(b).


Dated: December 22, 2020                    Respectfully Submitted,


By:  /s/ *Daniel Z. Goldman*

Daniel Z. Goldman
PETRILLO KLEIN & BOXER LLP
655 Third Avenue, 22nd Floor
New York, NY 10017
Phone: (212) 370-0330
dgoldman@pkbllp.com


By:  /s/ *Sean W. Gallagher*

Sean W. Gallagher (*pro hac vice forthcoming*)
Adam L. Hoeflich (*pro hac vice forthcoming*)
Mark S. Ouweleen (*pro hac vice forthcoming*)
Abby M. Mollen (*pro hac vice forthcoming*)
Nicolas L. Martinez (*pro hac vice forthcoming*)
Dawson K. Robinson (*pro hac vice forthcoming*)
BARTLIT BECK LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
Phone: (312) 494-4400
sean.gallagher@bartlitbeck.com
adam.hoeflich@bartlitbeck.com
mark.ouweleen@bartlitbeck.com
abby.mollen@bartlitbeck.com
nicolas.martinez@bartlitbeck.com
dawson.robinson@bartlitbeck.com


*Attorneys for Plaintiff Blue Cross and Blue Shield
Association*